USDC SCAN INDEX SHEET

R1R 2/13/06 13:22

3:04-CV-00760 RENO WILSON INC V. PR OPTICS

*80*

*AMDCMP.*

Karl M. Steins, SBN 179418
STEINS & ASSOCIATES, P.C.
2333 Camino Del Rio South, Suite 120
San Diego, California 92108
Telephone (619) 692-2004
Facsimile (619) 692-2003

Thomas F. DiPaolo, SBN 156779
DIPAOLO & ASSOCIATES APC
9820 Willow Creek Road, Suite 260
San Diego, California 92131
Telephone (858) 408-0621
Facsimile (858) 547-4691

Attorneys for Plaintiff Reno Wilson, Inc.

FILED
2006 FEB 10 PM 2:33
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY ______ DEPUTY

ORIGINAL

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RENO WILSON, INC., dba GATORZ<br><br>Plaintiff,<br><br>v.<br><br>PR OPTICS, LLC, a New Jersey limited liability corporation dba MAXAM EYEWEAR; RUSSEL LACASSE, an individual; PAUL D. DiFIORE, an individual,<br><br>Defendants. | Case No.: 04 CV 00760 LAB (BLM)<br><br>SECOND AMENDED COMPLAINT FOR PATENT INFRINGEMENT, UNFAIR COMPETITION, INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE, BREACH OF CONTRACT AND MISAPPROPRIATION OF TRADE SECRETS<br><br>DEMAND FOR JURY TRIAL |

JURISDICTION AND VENUE

1. This action arises under the Patent Laws of the United States, 35 USC §§ 271 and 281, for patent infringement, and under § 43(a) of the Lanham Act, 15 USC § 1125(a) for unfair trade practices. Jurisdiction over the subject matter is conferred on the Court under 28 USC § 1338 (a) and (b). Jurisdiction over the unfair competition claim is also conferred on this court by 28 USC § 1332 because of the existing diversity of citizenship between the parties and because the matter

80

in controversy, exclusive of interest and costs, exceeds the sum of $1,000,000. This court has jurisdiction of this action under 28 USC §§ 1332, 1338(a) and 1338(b).

2. Venue is proper in the Southern District of California in that all of the defendants are subject to personal jurisdiction in this district the time the action is commenced.

## THE PARTIES

3. Plaintiff Reno Wilson, Inc. is a California corporation doing business in California and elsewhere as Gatorz ("Gatorz"). Gatorz's principal place of business is in Poway, California, within the Southern District of California.

4. Gatorz is informed and believes, and on that basis alleges, that defendant PR Optics, LLC ("PR Optics") is a limited liability company with its principal place of business located at 3223 Route 38 West, Mt. Laurel, New Jersey. PR Optics does business throughout the United State of America, and specifically within the Southern District of the State of California under the fictitious business name of Maxam Eyewear.

5. Defendant Russell Lacasse ("Lacasse") is, and at all times mentioned was, an individual and resident of the State of Massachusetts. Gatorz is informed and believes, and on that basis alleges, that Lacasse is an officer of PR Optics.

6. Defendant Paul D. DiFiore ("DiFiore") is, and at all times mentioned was, an individual and resident of the State of New Jersey. Gatorz is informed and believes, and on that basis alleges, that DiFiore is an officer of PR Optics. Furthermore, Gatorz is informed and believes DiFiore is employed as an Advisory Director of Signet Armorlite, Inc., a Delaware Corporation with its principal place of business in San Marcos, California.

7. Gatorz is informed and believes, and on that basis alleges, that DiFiore and Lacasse both have and continue to do business within the State of California through numerous business dealings involving the eyewear industry including PR Optics, and (as to DiFiore, only) Signet Armorlite, Inc., a California corporation based in San Marcos, California of which DiFiore serves as Advisory Director.

8. The true names and capacities, whether individual, corporate, associate or otherwise, of defendants named as DOES 1 through 10, inclusive, are unknown to Gatorz, which is informed

and believes each of these fictitiously named defendants is in some way liable to Gatorz on the claims for relief action below. Therefore, Gatorz sues these defendants by fictitious names and will move to amend this Complaint to show the true names and capacities of these fictitiously named defendants when it has ascertained them.

9. Gatorz is informed and believes, and thereon alleges, that each of the defendants named was the agent and/or employee of each of the remaining defendants, and was at all times herein, acting within the scope and purpose of such agency and/or employment and with the consent, authorization, permission and ratification of the remaining co-defendants and each of them.

## GENERAL ALLEGATIONS

10. Gatorz is, and at all times and relevant to the matter alleged in this Complaint was, engaged in the business of designing, creating, producing, distributing and marketing sunglasses, specialty eyewear and related merchandise. Gatorz is widely recognized in the sunglass industry and by the general public as a unique source of high-quality and innovative billet-style, metal-framed sunglasses which are entirely formed from flat aluminum or titanium stock (hereinafter referred to as a "billet") and formed into a predetermined shape.

11. Gatorz expended considerable time, effort and moneys in the development of a method for making these unique billet-style, metal-framed sunglasses. In or before 1995 Gatorz introduced the metal sunglasses to the general public, and has sold them throughout the world under the trademark "Gatorz." The sunglasses achieved instantaneous and widespread acceptance by the general public and generated substantial profits to Gatorz.

12. As is customary to protect its investment in the development of such a unique product, Gatorz filed an application for United States Letters Patent serial number 564,489. On December 10, 1996, United States Utility Patent No. 5,583,583 was duly and legally issued in the name of Ken Wilson as inventor of the billet-style, metal-framed sunglasses and the method of making the same ("the '583 Patent"). A true and accurate copy of the foregoing '583 Patent is attached to this Complaint as Exhibit A. Gatorz is the owner by assignment of the entire right, title and interest in and to the foregoing Patent.

////

13. Gatorz filed an application (Ser. No. 46,871) on November 20, 1995 for a United States Design Patent for one design of its billet-style, metal-framed sunglasses. On September 9, 1997, United States Design Patent No. 383,478 was duly and legally issued in the name of Ken Wilson as inventor of this design for its billet- style, metal-framed sunglasses ("the '478 Design Patent"). A true and accurate copy of the '478Design Patent is attached to this Complaint as Exhibit B. Gatorz is the owner by assignment of the entire right, title and interest in and to the foregoing '478 Design Patent.

14. Gatorz filed an application (Ser. No. 53,097) on April 16, 1996 for a United States Design Patent for a second design of its billet-style, metal-framed sunglasses. On August 12, 1997, United States Design Patent No. 382,291 was duly and legally issued in the name of Ken Wilson as inventor of this design for its billet-style, metal-framed sunglasses ("the '291 Design Patent"). A true and accurate copy of the '291 Design Patent is attached to this Complaint as Exhibit C. Gatorz is the owner by assignment of the entire right, title and interest in and to the foregoing '291 Design Patent.

15. Gatorz filed an application (Ser. No. 67,910) on April 16, 1996 for a United States Design Patent for a third design of its billet- style, metal-framed sunglasses. On March 17, 1998, United States Design Patent No. 392,307 was duly and legally issued in the name of Ken Wilson as inventor of this design for its billet-style, metal-framed sunglasses ("the '307 Design Patent"). A true and accurate copy of the '307 Design Patent is attached to this Complaint as Exhibit D. Gatorz is the owner by assignment of the entire right, title and interest in and to the foregoing '307 Design Patent.

16. From or before 1995 to the present, Gatorz has hired defendants or their predecessors to manufacture Gatorz's billet-style, metal-framed sunglasses. Prior to disclosing to defendants the methodology of manufacture and other related trade secrets pertaining to Gatorz's sunglasses, Gatorz required defendants to execute an agreement preventing and precluding defendants from disclosing any trade secrets acquired as a result of the business relationship between Gatorz and those defendants.

////

17. Gatorz is informed and believes that defendants have and continue to manufacture, sell and market billet-style, metal-framed sunglasses which are identical to or so closely resemble Gatorz's billet-style, metal-framed sunglasses as to be indistinguishable from Gatorz's products. And Gatorz is further informed and believes defendants are engaging in such acts in effort to deceive consumers into purchasing their "knock off" products with the belief that such products are actually those of Gatorz. Attached as Exhibit E to this Complaint are photographs of representative examples of offending products which defendants have manufactured and sold.

**FIRST CLAIM FOR RELIEF**
**(Patent Infringement Against All Defendants)**

18. Gatorz realleges Paragraphs 1 through 17.

19. Gatorz manufactures and sells goods made in accordance with the Patent, and all the goods sold by the Gatorz since the issuance of the Patent have borne proper notice of said patent, pursuant to 35 USC § 287. Furthermore, defendants are aware of the existence of the Patent through their relationship as a manufacturer of Gatorz's.

20. Gatorz is informed and believes, and on that basis alleges, that defendants, in complete disregard of the Patent and in deliberate, knowing and wanton disregard for the rights of Gatorz, have manufactured and sold sunglasses which infringe upon the Patent. Such infringing product includes, but is not limited to, the items depicted on the photographs attached as Exhibit E to this First Amended Complaint. Such infringing activity on the part of defendants has occurred throughout the United States and specifically in this Southern District of California, and defendants will continue to engage in such infringing activities unless enjoined by this court.

21. Upon information and belief, defendants have by their aforementioned infringement of the Patent unlawfully derived substantial profits that Gatorz would otherwise have received.

22. Gatorz has been damaged by the infringing acts of the defendants in an amount unknown to Gatorz, but Gatorz asks leave to amend the amount of damages herein as soon as it has ascertained it.

////

////

**SECOND CLAIM FOR RELIEF**
**(Common-Law Unfair Competition by Infringement All Defendants)**
**[15 USC § 1125(a)]**

23. Gatorz realleges Paragraphs 1 through 22.

24. Gatorz's billet-style, metal-framed sunglasses have aesthetic features which make them distinctive and distinguish them from all other sunglasses which are available for sale within the U.S.

25. Since before 1995, Gatorz has invested significant sums in advertising and marketing of its billet-style, metal-framed sunglasses. Gatorz has sold significant quantities of its sunglasses since they were first introduced in the marketplace, and enjoys wide market circulation and popularity of its distinctive sunglasses.

26. As a result Gatorz's sales and advertising efforts of its billet-style, metal-framed sunglasses, the distinctive attributes of Gatorz's designs have acquired secondary meaning (*i.e.*, a mental association by a substantial segment of consumers and potential consumers between Gatorz's distinct designs and Gatorz as the single source for the product). These distinct attributes are, therefore, trade dress owned by Gatorz.

27. Defendants have and continue to infringe upon Gatorz's trade dress by manufacturing, marketing and selling billet-style, metal-framed sunglasses throughout the U.S. and specifically within this judicial district which look confusingly similar to those marketed and sold by Gatorz. Such product includes, but is not limited to, the items depicted on the photographs attached as Exhibit E to this First Amended Complaint.

28. The foregoing acts of trade dress infringement and unfair competition by defendants have been committed with the intent to cause confusion and mistake, and to deceive the public and consumers of sunglasses into believing that defendants' billet-style, metal-framed sunglasses are actually those of Gatorz or are in some other manner affiliated with, connected to or associated with Gatorz's billet-style, metal-framed sunglasses.

////

////

29. Consumers and the general public are, or are likely to be, confused, mistaken and deceived as to the origin of defendants' billet-style, metal-framed sunglasses, and the lack of actual affiliation, connection or association of defendants' billet-style, metal-framed sunglasses with those of Gatorz.

30. Gatorz is informed and believes, and on that basis alleges, that as a direct and proximate result of defendants' wrongful advertising and sale of billet-style, metal-framed sunglasses that are substantially indistinguishable from those of Gatorz as described above, defendants have derived profits in an unknown amount to be proven at trial.

31. As a further result of defendants' infringement of Gatorz's trade dress, Gatorz has sustained damages in an amount to be proven at trial but which is believed to be in excess of $1,000,000.

**THIRD CLAIM FOR RELIEF**
**(Intentional Interference With Prospective Economic Advantage Against All Defendants)**

32. Gatorz realleges Paragraphs 1 through 31.

33. In approximately August 2003, and after substantial effort and monetary investment by Gatorz, Gatorz entered into direct negotiations with representatives of Orange County Cycles ("OCC") to enter into a license agreement with OCC pursuant to which Gatorz would be the exclusive licensee of OCC's trademark and insignia for use on metal-frame sunglasses ("OCC glasses").

34. In their role as Gatorz's only manufacturer, defendants were aware of the license agreement and Gatorz's ongoing efforts to continue to service OCC's needs under that license agreement. Defendants' knowledge of such details was by means of contacts which were only known to defendants by reason of the manufacturing relationship which defendants had with Gatorz.

35. Defendants thwarted Gatorz's efforts to fulfill their obligations to OCC by intentionally delaying production and delivery of the OCC glasses which Gatorz had hired defendants to manufacture in furtherance of a license agreement between OCC and Gatorz. In so doing,

defendants intended to raise concerns by OCC as to whether Gatorz could reliably meet the quantity and delivery needs which OCC anticipated for Gatorz's products.

36. Defendants, knowing of the license agreement between OCC and Gatorz, further intentionally interfered to force OCC to terminate the license agreement by informing OCC that it could manufacture and deliver similar or identical products directly and at a lower cost to OCC, and that it could provide more reliable fulfillment of OCC's delivery needs than could Gatorz.

37. In furtherance of the license agreement between Gatorz and OCC, Gatorz had invested significant sums to expand production capacity of the OCC sunglasses and to market the OCC sunglasses. Gatorz anticipated it would derive significant profits from such an association with OCC.

38. This interference was designed to force OCC to terminate its license agreement with Gatorz and, instead, enter into such a license agreement with defendants. Furthermore, defendants secured for themselves an exclusive license relationship with OCC to sell products which infringe upon Gatorz's copyright, patent and trade dress rights.

39. As a result of defendants' intentional acts, the business relationship between Gatorz and OCC was disrupted in that OCC has informed Gatorz that it wishes to terminate its license agreement with Gatorz. Furthermore, Gatorz is informed and believes that defendants have entered into a long-term license agreement with OCC to provide sunglasses which are identical to or substantially similar to those which Gatorz had been supplying to OCC prior to defendants' unlawful interference.

40. Defendants' interference with the existing license and prospective business relationship between Gatorz and OCC has resulted in damage to Gatorz in an amount which is not fully known at this time, but believed to be in excess of $1,000,000.00.

41. Defendants' conduct was willful, wanton, malicious, and with reckless disregard for Gatorz's rights so as to justify an award of exemplary and punitive damages.

////

////

## FOURTH CLAIM FOR RELIEF

**(Intentional Interference With Prospective Economic Advantage Against PR Optics, DiFiore and Lacasse)**

42. Gatorz realleges Paragraphs 1 through 41.

43. In early 2004, Gatorz invested substantial effort and monetary outlay pursuing negotiations with a potential client named Roger Borget ("Borget") to enter into a license agreement with Borget pursuant to which Gatorz would be the exclusive licensee of Borget's trademark and insignia for use on metal-frame sunglasses ("Borget glasses").

44. In their role as Gatorz's only manufacturer, defendants were hired by Gatorz to manufacture various samples of billet-style, metal-framed sunglasses to present to Borget for approval and to entice Borget to enter into the license agreement sought by Gatorz. As such, defendants were aware of Gatorz's attempts to enter into the license agreement with Borget and Gatorz's ongoing negotiations with Borget for that purpose. Defendants' knowledge of such details was by means of contacts which were only known to defendants by reason of the manufacturing relationship which defendants had with Gatorz.

45. Defendants thwarted Gatorz's efforts to enter into a license agreement with Borget by interceding and making direct contact with Borget to try to persuade him to enter into such a license agreement with defendants rather than with Gatorz. Defendants, knowing of the negotiations for a license agreement between Borget and Gatorz, further intentionally interfered to dissuade Borget from entering into such a license agreement with Gatorz by informing Borget that it could manufacture and deliver similar or identical products directly and at a lower cost to Borget than could Gatorz.

46. Prior to the cessation of negotiations between Gatorz and Borget, Gatorz had invested significant sums attempting to secure a license agreement with Borget. Gatorz anticipated it would derive significant profits from such an association with Borget.

47. This interference was designed to dissuade Borget from entering into a license agreement with Gatorz and, instead, enter into such a license agreement with defendants.

////

Furthermore, defendants secured for themselves an exclusive license relationship with Borget to sell products which infringe upon Gatorz's copyright, patent and trade dress rights.

48. As a result of defendants' intentional acts, the business relationship between Gatorz and Borget was disrupted in that Gatorz is informed and believes that defendants have entered into a license agreement with Borget to provide sunglasses which are identical to or substantially similar to those which Gatorz offered to supply to Borget prior to defendants' unlawful interference.

49. Defendants' interference with the prospective business relationship between Gatorz and Borget has resulted in damage to Gatorz in an amount which is not fully known at this time, but believed to be in excess of $1,000,000.00.

50. Defendants' conduct was willful, wanton, malicious, and with reckless disregard for Gatorz's rights so as to justify an award of exemplary and punitive damages.

**FIFTH CLAIM FOR RELIEF**
**(Breach of Trade Secret Agreement All Defendants)**

51. Gatorz realleges Paragraphs 1 through 50.

52. In or before 1995 when Gatorz first hired defendants or their predecessors to manufacture Gatorz's billet-style, metal-framed sunglasses, Gatorz required defendants to execute a written agreement preventing and precluding defendants (and their predecessors in interest) from disclosing any trade secrets acquired as a result of the business relationship between Gatorz and those defendants ("the Trade Secret Agreement"). Pursuant to the terms of the Trade Secret Agreement, defendants were prohibited from ever disclosing or using for their own benefit Gatorz's proprietary manufacturing and assembly techniques used to create Gatorz's billet-style, metal-framed sunglasses.

53. Furthermore, the Trade Secret Agreement prohibited defendants from utilizing or disclosing to others, or using for their own benefit, the names of Gatorz's customers and potential customers.

54. Gatorz derives actual and potential independent economic value from the foregoing information not being generally known to the public or to other persons who can obtain

economic value from its disclosure or use. Furthermore, Gatorz took reasonable efforts to maintain its secrecy.

55. Defendants have breached the Trade Secret Agreement by, among other things, employing the proprietary manufacturing and assembly techniques obtained from Gatorz to manufacture "knockoff" sunglasses for sale directly by them and through other means of distribution. Defendants have also breached the Trade Secret Agreement by interfering with Gatorz's customer relationships with OCC and Borget as alleged in Paragraphs 42-45 and 55-57, respectively.

56. As a direct and proximate result of defendants' breach of the Trade Secret Agreement, Gatorz has been damaged in an amount to be proven at trial.

**SIXTH CLAIM FOR RELIEF**
**(Misappropriation of Trade Secrets All Defendants)**
**[California Civil Code §§ 3426, *et seq.*]**

57. Gatorz realleges Paragraphs 1 through 56.

58. In or before 1995, Gatorz disclosed to defendants (and their predecessors-in-interest) Gatorz's proprietary manufacturing and assembly techniques used to create Gatorz's billet-style, metal-framed sunglasses so that defendants (and their predecessors-in-interest) could manufacture such sunglasses for Gatorz. Defendants were also provided names of clients and potential clients from time to time in order that defendants could manufacture special orders for such customers.

59. Gatorz derives actual and potential independent economic value from the foregoing information not being generally known to the public or to other persons who can obtain economic value from its disclosure or use. Furthermore, Gatorz took reasonable efforts to maintain its secrecy.

60. At all time defendants knew or should have known that Gatorz's proprietary manufacturing and assembly techniques and the identities of Gatorz's customers were trade secrets.

////

61. Defendants acquired the foregoing trade secrets under circumstances giving rise to a duty to maintain its secrecy or limit its use and/or they were derived from or through a person who owed a duty to Gatorz to maintain its secrecy or limit its use.

62. Defendants misappropriated Gatorz's trade secrets by, among other things, employing the proprietary manufacturing and assembly techniques obtained from Gatorz to manufacture "knockoff" sunglasses for sale directly by them and through other means of distribution; and by interfering with Gatorz's customer relationships with OCC and Borget as alleged in Paragraphs 42-45 and 55-57, respectively.

63. As a direct and proximate result of defendants' misappropriation of Gatorz's trade secrets, Gatorz has been damaged in an amount to be proven at trial.

64. Defendants' conduct was willful, wanton, malicious, and with reckless disregard for Gatorz's rights so as to justify an award of exemplary and punitive damages.

**<u>SEVENTH CLAIM FOR RELIEF</u>**
**(Patent Infringement – '478 Design Patent –
All Defendants)**

65. Gatorz realleges Paragraphs 1 through 64.

66. Gatorz manufactures and sells goods made in accordance with the '478 Design Patent, and all the goods sold by Gatorz since the issuance of the '478 Design Patent have borne proper notice of said patent, pursuant to 35 USC § 287. Furthermore, defendants are aware of the existence of the '478 Design Patent through their relationship as a manufacturer of Gatorz's.

67. Gatorz is informed and believes, and on that basis alleges, that defendants, in complete disregard of the '471 Design Patent and in deliberate, knowing and wanton disregard for the rights of Gatorz, have manufactured and sold sunglasses which infringe upon the '471 Design Patent. Such infringing product includes, but is not limited to, the items depicted on the photographs attached as Exhibit E to this First Amended Complaint. Such infringing activity on the part of defendants has occurred throughout the United States and specifically in this Southern District of California, and defendants will continue to engage in such infringing activities unless enjoined by this court.

68. Upon information and belief, defendants have by their aforementioned infringement of the '471 Design Patent unlawfully derived substantial profits that Gatorz would otherwise have received.

69. Gatorz has been damaged by the infringing acts of the defendants in an amount unknown to Gatorz, but Gatorz asks leave to amend the amount of damages herein as soon as it has ascertained it.

**EIGHTH CLAIM FOR RELIEF**
**(Patent Infringement – '291 Design Patent – All Defendants)**

70. Gatorz realleges Paragraphs 1 through 69.

71. Gatorz manufactures and sells goods made in accordance with the '291 Design Patent, and all the goods sold by Gatorz since the issuance of the '291 Design Patent have borne proper notice of said patent, pursuant to 35 USC § 287. Furthermore, defendants are aware of the existence of the '291 Design Patent through their relationship as a manufacturer of Gatorz's.

72. Gatorz is informed and believes, and on that basis alleges, that defendants, in complete disregard of the '291 Design Patent and in deliberate, knowing and wanton disregard for the rights of Gatorz, have manufactured and sold sunglasses which infringe upon the '291 Design Patent. Such infringing product includes, but is not limited to, the items depicted on the photographs attached as Exhibit E to this First Amended Complaint. Such infringing activity on the part of defendants has occurred throughout the United States and specifically in this Southern District of California, and defendants will continue to engage in such infringing activities unless enjoined by this court.

73. Upon information and belief, defendants have by their aforementioned infringement of the '291 Design Patent unlawfully derived substantial profits that Gatorz would otherwise have received.

74. Gatorz has been damaged by the infringing acts of the defendants in an amount unknown to Gatorz, but Gatorz asks leave to amend the amount of damages herein as soon as it has ascertained it.

////

**NINTH CLAIM FOR RELIEF**
**(Patent Infringement – '307 Design Patent – All Defendants)**

75. Gatorz realleges Paragraphs 1 through 74.

76. Gatorz manufactures and sells goods made in accordance with the '307 Design Patent, and all the goods sold by Gatorz since the issuance of the '307 Design Patent have borne proper notice of said patent, pursuant to 35 USC § 287. Furthermore, defendants are aware of the existence of the '307 Design Patent through their relationship as a manufacturer of Gatorz's.

77. Gatorz is informed and believes, and on that basis alleges, that defendants, in complete disregard of the '307 Design Patent and in deliberate, knowing and wanton disregard for the rights of Gatorz, have manufactured and sold sunglasses which infringe upon the '307 Design Patent. Such infringing product includes, but is not limited to, the items depicted on the photographs attached as Exhibit E to this First Amended Complaint. Such infringing activity on the part of defendants has occurred throughout the United States and specifically in this Southern District of California, and defendants will continue to engage in such infringing activities unless enjoined by this court.

78. Upon information and belief, defendants have by their aforementioned infringement of the '307 Design Patent unlawfully derived substantial profits that Gatorz would otherwise have received.

79. Gatorz has been damaged by the infringing acts of the defendants in an amount unknown to Gatorz, but Gatorz asks leave to amend the amount of damages herein as soon as it has ascertained it.

PRAYER FOR RELIEF

WHEREFORE, Gatorz prays that judgment be entered as follows:

*On the First Claim for Relief:*

1. That the court find that defendants have infringed United States Patent No. 5,583,583;
2. For an award against defendants for the damages suffered by a Gatorz as a result of defendants' acts of infringement including prejudgment interest thereon;

////

3. An order enjoining defendants and their agents, servants, employees and attorneys and all other persons acting in concert or in participation that defendants from infringing Gatorz's United States Patent No. 5,583,583;
4. An injunction restraining defendants from infringing United States Patent No. 5,583,583.

*On the Third, Fourth and Sixth Claims for Relief:*

1. For punitive damages;

*On the Seventh Claim for Relief:*

1. That the court find that defendants have infringed United States Patent No. Des. 383,478;
2. For an award against defendants for the damages suffered by a Gatorz as a result of defendants' acts of infringement including prejudgment interest thereon;
3. An order enjoining defendants and their agents, servants, employees and attorneys and all other persons acting in concert or in participation that defendants from infringing Gatorz's United States Patent No. Des. 383,478;
4. An injunction restraining defendants from infringing United States Patent No. Des. 383,478.

*On the Eighth Claim for Relief:*

1. That the court find that defendants have infringed United States Patent No. Des. 382,291;
2. For an award against defendants for the damages suffered by a Gatorz as a result of defendants' acts of infringement including prejudgment interest thereon;
3. An order enjoining defendants and their agents, servants, employees and attorneys and all other persons acting in concert or in participation that defendants from infringing Gatorz's United States Patent No. Des. 382,291;
4. An injunction restraining defendants from infringing United States Patent No. Des. 382,291.

*On the Ninth Claim for Relief:*

1. That the court find that defendants have infringed United States Patent No. Des. 392,307;
2. For an award against defendants for the damages suffered by a Gatorz as a result of defendants' acts of infringement including prejudgment interest thereon;

3. An order enjoining defendants and their agents, servants, employees and attorneys and all other persons acting in concert or in participation that defendants from infringing Gatorz's United States Patent No. Des. 392,307;

4. An injunction restraining defendants from infringing United States Patent No. Des. 392,307.

*On All Claims for Relief:*

1. For damages in an amount to be ascertained at trial;
2. For reasonable attorneys' fees according to proof at trial;
3. For costs of suit; and
4. For such further relief as the court deems just

Dated: February 10, 2006

DIPAOLO & ASSOCIATES, APC

Thomas DiPaolo
Attorneys For Plaintiff Reno Wilson, Inc.

DEMAND FOR JURY TRIAL

Reno Wilson, Inc., hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Dated: February 10, 2006

DIPAOLO & ASSOCIATES, APC

Thomas DiPaolo
Attorneys For Plaintiff Reno Wilson, Inc.

# PROOF OF SERVICE

I am employed in the County of San Diego, State of California, over the age of 18 years and not a party to the within action. My business address is 9820 Willow Creek Road, Suite 260, San Diego, California 92131. On the date set forth below, I served to the foregoing [ ] original [X] true copy of the document(s) described as:

**SECOND AMENDED COMPLAINT FOR PATENT INFRINGEMENT, UNFAIR COMPETITION, INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE, BREACH OF CONTRACT AND MISAPPROPRIATION OF TRADE SECRETS; DEMAND FOR JURY TRIAL**

[ ] By transmitting via facsimile of the document(s) listed above to the fax number(s) set forth below, or as stated on the attached service list, on this date before 5:00 PM.

[X] By placing the documents(s) listed above in sealed envelope(s) with postage thereon fully prepaid, in the United States mail at San Diego, California, addressed as set forth below, or as stated on the attached service list.

[ ] By personally delivering the document(s) listed above to the person(s) at the address(es) set forth below, or on the attached service list.

Russell Lacasse
1023 North Woodstock Road
Southbridge, MA 01550

I am readily familiar with the firm's practice of collecting and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in the affidavit.

I declare that I am an employee in the office of a member of the bar of this court at whose direction the service was made.

Executed on February 10, 2006, and San Diego, California.

I declare under penalty of perjury under laws of the state of California that the above is true and correct.

# EXHIBIT "A"

US005583583A

# United States Patent [19]

Wilson

[11] Patent Number: 5,583,583

[45] Date of Patent: Dec. 10, 1996

[54] METAL FRAME SUNGLASSES AND METHOD OF MAKING THE SAME

[76] Inventor: Ken Wilson, 5384 Linda Vista Rd., #104, San Diego, Calif. 92110

[21] Appl. No.: 564,489

[22] Filed: Nov. 29, 1995

[51] Int. Cl.[6] ..................... G02C 1/08; G02C 5/14

[52] U.S. Cl. ..................... 351/41; 351/90; 351/122

[58] Field of Search ..................... 351/121, 122, 351/123, 111, 41, 158, 90, 92

[56] References Cited

U.S. PATENT DOCUMENTS


| | | | |
|---|---|---|---|
| 2,561,402 | 7/1951 | Nelson | 351/123 |
| 3,953,114 | 4/1976 | Bidgood | 351/123 |


*Primary Examiner*—Hung Dang
*Attorney, Agent, or Firm*—Charles C. Logan, II

[57] ABSTRACT

A pair of sunglasses having an elongated sunglasses frame that is entirely formed from a single sheet of flat aluminum or titanium stock that is bent into a predetermined shape. Left and right hinge mounting portions are formed adjacent the respective edges of the sunglasses frame. A left lens aperture is formed in the sunglasses frame between the left hinge mounting portion and the bridge portion. A right lens aperture is formed in the sunglasses frame between the right hinge mounting portion and the bridge portion. The dimensions of the respective apertures have a greater height and a greater width on the front surface of the sunglasses frame so that lenses pressed into the respective apertures through their front surface edge won't pass out its rear surface edge. A groove is formed in the periphery of each of the apertures and they mate with a ridge formed on the periphery of the respective left and right sunglasses lenses. The metal material of the sunglasses frame permits sufficient stretching or elongation of the material around the lens apertures to allow the sunglass lenses to snap into the grooves around the perimeter of the lens apertures.

17 Claims, 2 Drawing Sheets





10
80
82
14
12
16
22
45
23
FIGURE 1
W3
W2
W1
4
12
A1
50
30
42
32
H4
35
44
28
A2
26
29
33
35
FIGURE 2
5
4
T1
32
H2
H1
H3
40
33
FIGURE 4
14
16
10
56
54
5
52
22
23
12
FIGURE 3




FIGURE 5




FIGURE 6




FIGURE 7

# METAL FRAME SUNGLASSES AND METHOD OF MAKING THE SAME

## BACKGROUND OF THE INVENTION

The invention relates to sunglasses and more specifically to sunglasses having a frame punched out of a flat sheet of metal and then has left and right lens apertures machined therein.

Presently, most metal glasses frames are made of nickel and other strong metals. The metal structure of these frames have thin extruded sections that are bent into desired shapes and the frame structure surrounding the lens apertures do not form a closed loop into which the lens is inserted. Instead, the structure surrounding the lens apertures are split. This allows the lens aperture to be opened wider for inserting the lens. Then the open portions of the split frame are drawn together and a tightened screw holds the two portions of the frame loop together around the lens. This is known as a screw mounting lens system.

In the past one manufacturer made cast aluminum sunglasses frames, but the frames had to be slit in order to get the lens in and out. A screw had to be used to pull the two open ends of the frame together around the lens that had been inserted into the frame.

Plastic eyeglasses and sunglasses frames use what is called tension mounting, meaning the lens is held without screws and is kept in place by tension. The eyeglasses and sunglasses industry has consistently been of the opinion that metal sunglasses frames cannot be made that would use only tension mounting for holding the lenses in the sunglasses frame.

Prior art, metal eyeglasses and Sunglasses frames could not be adapted for tension mounting lenses therein. Their thin metal frames bend too easily and have their shape distorted.

It is an object of the invention to provide a novel metal sunglasses frame that allows lenses to be tension mounted in machined apertures in the metal frame.

It is also an object of the invention to provide a novel aluminum or titanium sunglasses frame that has been manufactured from a sheet of flat material.

It is another of the invention to provide a novel sunglasses frame made of aluminum or titanium that is economical to manufacture and market.

It is an additional object of the invention to provide a novel pair of sunglasses having temple members with unique rubber ear pads mounted on their inner surfaces that eliminates the tendency of the sunglasses to slip or move around while participates in active sports.

It is a further object of the invention to provide a novel pair of sunglasses that is made of aluminum or titanium that has a tendency to absorb heat but not retain it and thereby prevent the lenses from fogging when worn during active sporting events.

## SUMMARY OF THE INVENTION

The novel sunglasses frame has been produced from flat sheet stock of aluminum or titanium material. Initially a blank is punched from the sheet material. The blank of the sunglasses frame is then set up for milling the left and right sunglasses lens apertures. Also grooves are milled around the perimeter of the lens aperture for receiving the perimeter ridge on the lenses. Recesses are formed in the rear wall of the blank for receiving the hinges. Holes for the hinges and



the nose piece are then drilled in the blank. Counterbores are formed in the front surface of the blank opposite its hinge mounting holes. The blank at this juncture is heat treated in an annealing process to allow the frame to have compound bends formed adjacent the hinge mounting portions and also form the spherical radius for each lens aperture. Finally the sunglass frame is heat treated to harden the material of the frame. The assembly process follows and at that time hinges are riveted to the frame and the left and right temple members. The left and right sunglasses lens are then tension mounted in the frame.

If the sunglasses frame is going to have the sunglass lenses installed using the screw mounting system, a horizontal cut is made from the respective left and right edges of the frame at its hinge mounting portions through until it intersects the perimeter of the lens apertures. The respective left and right sunglass lenses can then be inserted into their respective apertures and the top and bottom halves of the hinge mounting portions can be secured together by tightening the upper and lower hinge members whose opposite ends are secured to the front end of the temple members.

The temple members are also made from flat sheet stock material such as aluminum or titanium. The temple members are punched out of a blank sheet of metal and elongated recesses are milled on their inner surfaces and extend to a point adjacent their rear ends. Resilient ear pads are glued in the recesses and they extend only a short height above the surface surrounding the recesses. The ear pads have been designed to conceal their installation on the temple members. This keeps them from detracting from the style and aesthetics of the temple members. The ear pads allow the sunglasses to stay on the users head without slipping while participating in sports such as mountain biking, snow skiing, snow boarding, hiking, running and other outdoor sports. The silicone rubber used is hydrophilic, which absorbs sweat and creates a sticky feeling to help the glasses stay snug when a person perspires.

The use of solid sheets of aluminum or titanium metal for the sunglass frames creates a massive heat sink for conducting heat away from the wearer's head. Aluminum and titanium, unlike other metals, has a tendency to absorb heat but not to retain it. Sunglasses that wrap close to the wearer's head will create fogging problems if used during a strenuous activity. The mass of material of the sunglasses frame conducts heat and takes it away from the lens therefore allowing the lens not to fog in extreme conditions. Ventilation of the area surrounding the lens is not a critical problem when using the novel titanium or aluminum sunglass frames.

An added advantage of the novel aluminum or titanium sunglasses frame is that when left in the sun on the dashboard or seat of a vehicle, they do get hot, but they cool quickly.

## DESCRIPTION OF THE DRAWINGS

FIG. 1 is a front perspective view of the novel sunglasses;

FIG. 2 is a rear elevation view of the sunglass frame;

FIG. 3 is a top plan view of the novel sunglasses;

FIG. 4 is an enlarged cross sectional view taken along lines 4—4 of FIG. 2;

FIG. 5 is a side elevation view showing the upper and lower hinge assemblies connecting the sunglasses frame to a temple member;

FIG. 6 is a partial side elevation view of the temple member and the inside surface of an alternative sunglasses frame; and

FIG. 7 is a side elevation view of the inner surface of a novel temple member.

## DESCRIPTION OF THE PREFERRED EMBODIMENT

The novel sunglasses will now be described by referring to FIGS. 1-7 of the drawings. The sunglasses are generally designated numeral 10.

Sunglasses 10 have a sunglasses frame 12, a left temple member 14 and a right temple member 16. Upper hinge assemblies 18 and lower hinge assemblies 20 secure the front ends of the temple members to the lens frame 12. Almond shaped sunglasses lenses 22 and 23 are tension mounted in lens frame 12.

Sunglasses frame 12 will be specifically described by referring to FIG. 2. The bottom edge of lens frame 12 has a nose recess 26 formed between left lens aperture 28 and right sunglass lens aperture 29. A bridge portion 30 is formed above nose recess 26.

Each sunglass lens aperture in the sunglasses frame has a top rim member 32 and a bottom rim member 33. A hinge mounting portion 35 is located adjacent each of the respective ends of sunglass frame 12. It is critical that the sunglasses frame have a predetermined amount of mass of metal material around the lens apertures. If the rim members 32 and 33 don't have a sufficient height, these members will distort and fracture when the lenses are forced into the lens apertures. Likewise if the height of the rim members are too great, they will be unable to stretch a sufficient amount to allow the lens to snap into the lens apertures. Top rim member 32 and bottom rim member 33 have a height A1 that is in the range of 0.050-0.200. Each of the sunglasses lens apertures 28 and 29 have a front surface aperture that is greater than the rear surface aperture. The front surface aperture 37 has a height H1 and a width W1. H1 is in the range of 1.000-2.000. W1 is in the range of 2.000-3.000 inches. The rear surface aperture 39 has a height H2 and a width W2. Its dimensions are smaller than that of the front surface aperture so that a lens inserted from its front surface will not pass through and out the rear of the aperture. A V-shaped groove 40 is formed in the interior of the respective lens apertures and they have a height H3 and a width W3. The left and right hinge mounting portions 35 have a height H4 that is in the range of 0.300-0.900 inches. Recesses 42 are formed in the rear surface of lens frame 12 for receiving the hinge assemblies. Apertures 44 pass entirely through the thickness of lens frame 12 and have countersunk recesses 45 to receive one end of the rivets 46 that are inserted therethrough.

Recesses 50 are drilled into the rear surface of bridge 30. Internally threaded bushings 52 have their one end forced therein and a noseguard 54 is secured thereto by screws 56.

An alternative embodiment of the lens frame is illustrated in FIG. 6 and it is designated numeral 60. It has a horizontal slit 62 that divides the hinge mounting portion into an upper portion 64 and a lower portion 65. Conventional screws 70 in upper hinge assembly 18 and lower hinge assembly 20 keep the sunglass lens 23 secured in its aperture.

The inner surface of temple member 14 is illustrated in FIG. 7. Temple member 14 and temple member 15 have a length L1. An elongated recess 80 extends from a point adjacent the rear end of temple member 14 along a substantial portion of its length. A pad 82 of resilient material such as rubber is glued in recess 80 and it has a thickness only slightly greater than the depth of recess 80 to provide a gripping surface against the side of the head of the person wearing the sunglasses.

What is claimed is:

1. A pair of sunglasses comprising:

an elongated sunglasses frame having a front surface, a rear surface, a top edge, a bottom edge, a left edge and a right edge; said sunglasses frame being entirely formed from a single sheet of flat aluminum stock that is bent into a predetermined shape; the bottom edge of said sunglasses frame having a centrally formed nose recess; the structure between said top edge and said nose recess is a bridge portion; a left hinge mounting portion is formed adjacent said left edge and a right hinge mounting portion is formed adjacent said right edge;

a left lens aperture in said sunglasses frame between said left hinge mounting portion and said bridge portion and it forms a top rim member and a bottom rim member each having respective heights A1 and A2 and A1 and A2 are both in the range of 0.050-200 inches;

a right lens aperture in said sunglasses frame between said right hinge mounting portion and said bridge portion and it forms a top rim member and a bottom rim member each having respective heights A1 and A2 and A1 and A2 are both is in the range of 0.050-0.200 inches;

said left lens aperture having a predetermined configuration in said sunglasses frame and it has a front surface edge and a rear surface edge; the maximum height and width of said lens aperture at its front surface edge is H1 and W1; the maximum height and width of said lens aperture at its rear surface edge is H2 and W2; H1 is greater than H2 and W1 is greater than W2 so that a lens pressed into said left lens aperture through its front surface edge won't pass out its rear surface edge; a groove is formed in said sunglasses frame in the periphery of said left lens aperture and said groove has a bottom surface; the maximum height of the bottom surface of said groove of said lens aperture is H3 and the maximum width of the bottom surface of said lens aperture is W3 and H3 is greater than H1 and W3 is greater than W1;

said right lens aperture having a predetermined configuration in said sunglasses frame and it has a front surface edge and a rear surface edge; the maximum height and width of said lens aperture at its front surface edge is H1 and W1; the maximum height and width of said lens aperture at its rear surface edge is H2 and W2; H1 is greater than H2 and W1 is greater than W2 so that a lens pressed into said right aperture through its front surface edge won't pass out its rear surface edge; a groove is formed in said sunglasses frame in the periphery of said right lens aperture and said groove has a bottom surface; the maximum height of the bottom surface of said groove of said lens aperture is H3 and the maximum width of the bottom surface of said lens aperture is W3 and H3 is greater than H1 and W3 is greater than W1;

a left sunglass lens and a right sunglass lens and each has a ridge that extends around its periphery and said ridge is of a configuration to mate with the respective grooves in said respective left and right lens apertures; said left and right sunglass lens each having a height greater than H1 and a width greater than W1; said left and right sunglass lens being mounted in their respective left and right lens apertures by pressing them into

the front of their respective lens apertures until their top and bottom rim members have stretched enough to allow said sunglasses lenses to snap into the grooves around the perimeter of said lens apertures;

a left temple member having a front end and hinge means connecting said front end to said left hinge mounting portion of said sunglasses frame; and

a right temple member having a front end and hinge means connecting said front end to said right hinge mounting portion of said sunglasses frame.

2. A pair of sunglasses as recited in claim 1 wherein the rear surface of said sunglass frame has a concave curvature to conform to the face of a person who would wear the sunglasses.

3. A pair of sunglasses as recited in claim 1 wherein said sunglasses frame has a thickness T1 in the range of 0.050–0.200 inches.

4. A pair of sunglasses as recited in claim 1 wherein said left and right lens aperture have an almond shape.

5. A pair of sunglasses as recited in claim 1 wherein the right edge and left edge of said sunglass frame each have a height H4 in the range of 0.250–1.000 inches.

6. A pair of sunglasses as recited in claim 1 wherein the rear surface of said left and right sunglass lens each have a concave curvature.

7. A pair of sunglasses as recited in claim 1 wherein H1 is in the range of 1.000–2.000 inches and W1 is in the range of 2.000–3.000 inches.

8. A pair of sunglasses as recited in claim 1 wherein the left and right hinge mounting portions of said sunglasses frame have been cut along a horizontal line from their rear edge to their respective lens aperture to form a top half and a bottom half that allows the respective top half and bottom half to be spread apart so that a sunglasses lens can be installed in the respective lens apertures.

9. A pair of sunglasses comprising:

an elongated sunglasses frame having a front surface, a rear surface, a top edge, a bottom edge, a left edge and a right edge; said sunglasses frame being entirely formed from a single sheet of flat titanium stock that is bent into a predetermined shape; the bottom edge of said sunglass frame having a centrally formed nose recess; the structure between said top edge and said nose recess is a bridge portion; a left hinge mounting portion is formed adjacent said left edge and a right hinge mounting portion is formed adjacent said right edge;

a left lens aperture in said sunglasses frame between said left hinge mounting portion and said bridge portion and it forms a top rim member and a bottom rim member each having respective heights A1 and A2 and A1 and A2 are both in the range of 0.050–0.200 inches;

a right lens aperture in said sunglasses frame between said right hinge mounting portion and said bridge portion and it forms a top rim member and a bottom rim member each having respective heights A1 and A2 and A1 and A2 are both in the range of 0.050–0.200 inches;

said left lens aperture having a predetermined configuration in said sunglasses frame and it has a front surface edge and a rear surface edge; the maximum height and width of said lens aperture at its front surface edge is H1 and W1; the maximum height and width of said lens aperture at its rear surface edge is H2 and W2; H1 is greater than H2 and W1 is greater than W2 so that a lens pressed into said left lens aperture through its front surface edge won't pass out its rear surface edge; a



groove is formed in said sunglasses frame in the periphery of said left lens aperture and said groove has a bottom surface; the maximum height of the bottom surface of said groove of said lens aperture is H3 and the maximum width of the bottom surface of said lens aperture is W3 and H3 is greater than H1 and W3 is greater than W1;

said right lens aperture having a predetermined configuration in said sunglasses frame and it has a front surface edge and a rear surface edge; the maximum height and width of said lens aperture at its front surface edge is H1 and W1; the maximum height and width of said lens aperture at its rear surface edge is H2 and W2; H1 is greater than H2 and W1 is greater than W2 so that a lens pressed into said right aperture through its front surface edge won't pass out its rear surface edge; a groove is formed in said eyeglasses frame in the periphery of said right lens aperture and said groove has a bottom surface; a maximum height of the bottom surface of said groove of said lens aperture is H3 and the maximum width of the bottom surface of said lens aperture is W3 and H3 is greater than H1 and W3 is greater than W1;

a left sunglasses lens and a right sunglasses lens and each has a ridge that extends around its periphery and said ridge is of a configuration to mate with the respective grooves in said respective left and right lens apertures; said left and right sunglasses lens each having a height greater than H1 and a width greater than W1; said left and right sunglasses lens being mounted in their respective left and right lens apertures by pressing them into the front of their respective lens apertures until their top and bottom rim members have stretched enough to allow said sunglasses lenses to snap into the grooves around the perimeter of said lens apertures;

a left temple member having a front end and hinge means connecting said front end to said left hinge mounting portion of said sunglasses frame; and

a right temple member having a front end and hinge means connecting said front end to said right hinge mounting portion of said sunglasses frame.

10. A pair of sunglasses as recited in claim 9 wherein the rear surface of said sunglass frame has a concave curvature to conform to the face of a person who would wear the sunglasses.

11. A pair of sunglasses as recited in claim 9 wherein said sunglasses frame has a thickness T1 in the range of 0.060–0.200 inches.

12. A pair of sunglasses as recited in claim 9 wherein said left and right lens aperture have an almond shape.

13. A pair of sunglasses as recited in claim 9 wherein the right edge and left edge of said sunglasses frame each have a height H4 in the range of 0.250–1.000 inches.

14. A pair of sunglasses as recited in claim 9 wherein the rear surface of said left and right sunglasses lens each have a concave curvature.

15. A pair of sunglasses as recited in claim 9 wherein H1 is in the range of 1.000–2.000 inches and W1 is in the range of 2.000–3.000 inches.

16. A pair of sunglasses as recited in claim 9 wherein the left and right hinge mounting portions of said sunglasses frame have been cut along a horizontal line from their rear edge to their respective lens aperture to form a top half and a bottom half that allows the respective top half and bottom half to be spread apart so that a sunglasses lens can be installed in the respective lens apertures.

17. A method of making a pair of sunglasses comprising the following steps:

a) taking of sheet of metal having a thickness T1 in the range of 0.050–0.150 inches and punch a blank out of it having the outer peripheral shape of a sunglasses frame;

b) milling left and right sunglasses lens apertures in said blank;

c) milling grooves around the perimeter of said lens apertures for receiving the perimeter ridge on the lenses;

d) subjecting said sunglasses frame to a heat treatment process for annealing the metal of said frame to reduce its brittleness;

e) bending said sunglasses frame at its hinge mounting portions and also bending spherical radius for said lens apertures;

f) subjecting said sunglasses frame to a heat treatment process to harden the metal material of said frame.

* * * * *

# EXHIBIT "B"

US00D383478S

# United States Patent [19]

Wilson

[11] Patent Number: Des. 383,478

[45] Date of Patent: **Sep. 9, 1997

[54] SUNGLASSES

[76] Inventor: Ken Wilson, 540 Linda Vista Rd., San Diego, Calif. 92110

[**] Term: 14 Years

[21] Appl. No.: 46,871

[22] Filed: Nov. 24, 1995

[51] LOC (6) Cl. ... 16-06

[52] U.S. Cl. ... D16/326

[58] Field of Search ... D16/101, 300, D16/306, 309, 311-330, 335, 341; D29/110; 351/41, 44, 51, 52, 62, 83, 103, 111-121, 158; 2/428, 430, 436, 437, 440

[56] References Cited

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 192,884 | 5/1962 | Pedno | D16/326 |
| D. 205,419 | 8/1966 | Griss | D16/326 |
| D. 245,251 | 8/1977 | Zimmermann | D16/329 |
| D. 323,516 | 1/1992 | Mikhitarian | D16/328 |
| D. 363,504 | 10/1995 | Amette | D16/326 |
| D. 368,108 | 3/1996 | Lei | D16/326 |
| D. 369,375 | 4/1996 | Jannard | D16/326 |
| 5,331,356 | 7/1994 | Chiou | 351/41 |

OTHER PUBLICATIONS

Vogue May 1992.
Domus Oct. 1985 p. 55.

*Primary Examiner*—Raphael Barkai
*Attorney, Agent, or Firm*—Charles C. Logan

[57] CLAIM

The ornamental design for sunglasses, as shown and described.

DESCRIPTION

FIG. 1 is a front elevation view of the novel sunglasses;
FIG. 2 is a right side elevation view thereof;
FIG. 3 is a rear elevation view thereof;
FIG. 4 is a left side elevation view thereof;
FIG. 5 is a bottom plan view thereof; and,
FIG. 6 is a top plan view thereof.

1 Claim, 1 Drawing Sheet





FIGURE 1



FIGURE 2



FIGURE 3



FIGURE 4



FIGURE 5



FIGURE 6

# EXHIBIT "C"

US00D382291S

# United States Patent [19]

Wilson

[11] Patent Number: Des. 382,291
[45] Date of Patent: **Aug. 12, 1997

[54] SUNGLASSES

[76] Inventor: Ken Wilson, 5430 Linda Vista Rd., #2, San Diego, Calif. 92110

[**] Term: 14 Years

[21] Appl. No.: 53,097

[22] Filed: Apr. 16, 1996

[51] LOC (6) Cl. .......... 16-06
[52] U.S. Cl. .......... D16/326
[58] Field of Search .......... D16/101, 300, D16/306, 309, 311-330, 335, 341; D29/110; 351/41, 44, 51-52, 62, 83, 103, 111-121, 158; 2/428, 430, 436, 437, 440

[56] References Cited

U.S. PATENT DOCUMENTS

D. 185,059 5/1959 Behr .......... D16/309
D. 192,884 5/1962 Petino .......... D16/326
D. 205,419 8/1966 Griss .......... D16/326
D. 244,282 5/1977 Teufelhart .......... D16/329
D. 323,516 1/1992 Miklitarian .......... D16/328
D. 347,014 5/1994 Ameche .......... D16/326
D. 363,504 10/1995 Ameche .......... D16/326
D. 369,375 4/1996 Jannard et al. .......... D16/326
5,331,356 7/1994 Chiou .......... 351/158

OTHER PUBLICATIONS

Vogue, May 1992.
Sunglasses Hut International Catalog, Holiday 1994 Frames "A" top of page.
Accessories, Dec. 1986 front cover.

*Primary Examiner*—Raphael Barkai

[57] CLAIM

The ornamental design for sunglasses, as shown and described.

DESCRIPTION

FIG. 1 is an actual size bottom plan view of the novel sunglasses;
FIG. 2 is an actual size left side elevation view thereof;
FIG. 3 is an actual size rear elevation view thereof;
FIG. 4 is an actual top plan view thereof;
FIG. 5 is an actual size right side elevation view thereof; and,
FIG. 6 is an actual size front elevation view thereof.

1 Claim, 2 Drawing Sheets





FIGURE 1



FIGURE 2



FIGURE 3



FIGURE 4



FIGURE 5



FIGURE 6

# EXHIBIT “D”

US00D392307S

# United States Patent [19]

Wilson

[11] Patent Number: Des. 392,307

[45] Date of Patent: **Mar. 17, 1998

[54] SUNGLASSES FRAME

[76] Inventor: Ken Wilson, 12925 BrookPrinter. Pl. #200, Poway, Calif. 92064

[**] Term: 14 Years

[21] Appl. No.: 67,910

[22] Filed: Apr. 7, 1997

[51] LOC (6) Cl. .......... 16-06

[52] U.S. Cl. .......... D16/326

[58] Field of Search .......... D16/300, 311, D16/315-330, 335; 351/41, 44, 51, 52, 83, 90, 158; 2/447, 448

[56] References Cited

U.S. PATENT DOCUMENTS

D. 212,392 10/1968 Mitchell .......... D16/326
D. 363,504 10/1995 Amene .......... D16/326
5,541,674 7/1996 Jannard .......... 351/41
5,583,583 12/1996 Wilson .......... 351/41
5,610,668 3/1997 Mage .......... 351/41

OTHER PUBLICATIONS

Sunglass Hut Catalog, p. 15, Frames 425081, Dec. 4, 1996.
Domus, p. 55, Oct. 1985.

*Primary Examiner*—Raphael Barkai

[57] CLAIM

The ornamental design for a sunglasses frame, as shown and described.

DESCRIPTION

FIG. 1 is a front elevation view of the novel sunglasses frame;

FIG. 2 is a top plan view thereof;

FIG. 3 is a right side elevation view thereof and the left side elevation view is exactly the same but reversed;

FIG. 4 is a rear elevation view thereof;

FIG. 5 is a bottom plan view thereof;

FIG. 6 is a partial front elevation view of the nose portion of an alternative embodiment that doesn't have a bump in its front surface;

FIG. 7 is a top plan view of the structure illustrated in FIG. 6; and

FIG. 8 is a rear elevation view of the structure illustrated in FIG. 6.

1 Claim, 2 Drawing Sheets





FIGURE 1



FIGURE 2



FIGURE 3



FIGURE 4



FIGURE 5



FIGURE 7



FIGURE 6



FIGURE 8

# EXHIBIT “E”






SLICE
Polished
Silver Mirror












MAXAMIZER
Gunmetal
Blue Mirror